IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| IN RE: | ) | BK 10-81026 |
| | ) | |
| TIBURON POINTE APARTMENTS, | ) | |
| L.L.C., | ) | |
| | ) | |
| Debtor. | ) | |

**MOTION FOR ORDERS PURSUANT TO 11 U.S.C. §§ 105(a), 363 AND 365
AUTHORIZING AND APPROVING THE SALE OF SUBSTANTIALLY ALL OF THE
DEBTOR'S ASSETS FREE AND CLEAR OF LIENS, CLAIMS, AND
ENCUMBRANCES AND THE ASSUMPTION AND ASSIGNMENT OF EXECUTORY
CONTRACTS AND UNEXPIRED LEASES**

COMES NOW Tiburon Pointe Apartments, L.L.C. ("Debtor") by and through its undersigned attorneys and hereby moves (the "Sale Motion") this Court for entry of an order, pursuant to 11 U.S.C. §§ 105(a) and 363 of title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (as hereinafter defined) and Rules 2002, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (as hereinafter defined), authorizing and approving:  (a) the sale (the "Sale") of substantially all of the Debtors' assets, free and clear of all liens, claims, encumbrances and interests, with liens, claims, encumbrances and interests to attach to the proceeds of the Sale, to Elkco Properties Inc. pursuant to the Asset Purchase Agreement (the "Agreement") dated March 18, 2011 by and among the Debtor and the Buyer; and (b) granting related relief.  A copy of the Agreement is attached hereto as Exhibit A.  In support of this Sale Motion, the Debtor respectfully represent as follows:

**Background and Status of Case**

1.     On or about April 7, 2010, the Debtor herein filed a voluntary bankruptcy petition with the U.S. Bankruptcy Court for the District of Nebraska seeking the entry of an Order for Relief under Chapter 11 of the Bankruptcy Code ("Debtor's Petition").  The Debtor's Petition

reflects that this is a "single asset real estate" case. The primary asset owned by the Debtor at all relevant times is an apartment complex located at 16883 and 16889 Oakmont Drive, Omaha, Nebraska. This apartment complex is located adjacent to an apartment complex owed by Tiburon View Apartments, L.P. ("Tiburon View") 16895, 16901, 16907 and 16913, Oakmont Drive, Omaha, Nebraska. Tiburon View also filed a Chapter 11 Bankruptcy Petition on April 7, 2010 with the U.S. Bankruptcy Court for the District of Nebraska. The apartment complexes of Tiburon Pointe and Tiburon View are collectively referred to herein as the "apartment complex."

2.    On July 8, 2010, the Debtor filed an Application to Employ Realtor wherein the Debtor requested court approval for the Debtor to employ Walt Peffer and P.J. Morgan Real Estate for the purpose of marketing and soliciting bids for the purchase of the Debtor's apartment complex and the adjacent Tiburon View apartment complex. This application was approved by the Bankruptcy Court on July 9, 2010. A similar application to employ was filed in the Tiburon View bankruptcy case on the same date, and was approved by the Bankruptcy Court on July 9, 2010.

3.    Since July 9, 2010, Walt Peffer and P.J. Morgan Real Estate have been actively marketing the Tiburon View and Tiburon Pointe apartment complexes.

4.    The Debtor filed a Disclosure Statement and Plan of Reorganization on August 6, 2010. Various parties in interest including Wells Fargo Bank, N.A. and minority interest holder Brian Bidne filed objections to the Debtor's Disclosure Statement. These objections were sustained. On February 16, 2011, the Debtor filed an Amended Disclosure Statement and Amended Plan of Reorganization. Mr. Bidne requested and received an extension of the deadline to object to the Amended Disclosure Statement from March 13, 2011 to April 13, 2011.

5.      Wells Fargo Bank, N.A. ("Wells Fargo") is the primary secured creditor of the

Debtor.  The Debtor's Amended Disclosure Statement and Amended Plan propose to pay off the

indebtedness debt to Wells Fargo pursuant to a thirty year amortization period with a balloon

payment due ten years after the effective date of the Plan.  Wells Fargo has advised that it objects

to this proposed treatment of its claim in the Debtor's Chapter 11 Amended Plan.

6.      On September 13, 2010, Mr. Bidne filed a Motion to Appoint a Chapter 11

Trustee in this case and in the related Tiburon View case along with Mr. Walker.  These motions

were settled between the Debtor and the moving parties in October of 2010.  Pursuant to this

settlement, P.J. Morgan Real Estate was appointed as the property manager for the Tiburon

Pointe and Tiburon View Apartment Complex.  On February 15, 2011, Mr. Bidne and Mr.

Walker requested a hearing on their Motions to Appoint a Chapter 11 Trustee.  This hearing is

presently set for April 15, 2011.  Mr. Bidne and Mr. Walker, however, have advised that they

will continue this hearing pending the Court's determination on the proposed sale of the property.

**Proposed Sale of Assets**

7.      On or about February 16, 2011, Elkco Properties, Inc. ("Elkco") submitted a

proposed Commercial Purchase Agreement to Walt Peffer and P.J. Morgan Real Estate wherein

it proposed to purchase the apartment complexes of Tiburon View and Tiburon Pointe, together,

for a total purchase price of Seven Million Nine Hundred Fifty Thousand Dollars and No/100

($7,950,000.00).  On February 23, 2011, Elkco submitted an amended proposed Commercial

Purchase Agreement.  Attached hereto as Exhibit A is a true and correct copy of this amended

Commercial Purchase Agreement.

8.      In accordance with the organizational documents of the Debtor, on February 24,

2011, the offer of Elkco and the amended Commercial Purchase Agreement was submitted to the

limited partners of Tiburon View and the members of Tiburon Pointe for consideration. A quorum being present, a majority of equity interest holders in Tiburon View and Tiburon Pointe advised that they were agreeable to selling the property upon the terms offered by Elkco provided the Debtors could negotiate an acceptable resolution and release of the claims of the primary secured lenders of Tiburon View and Tiburon Pointe. The other equity interest holders abstained from either voting or providing comments or advice about the proposed sale.

9.     On July 14, 2010, Wells Fargo, the primary secured lender for Tiburon Pointe, filed a Proof of Claim in this case wherein Wells Fargo stated that it held a claim against Tiburon Pointe in the total amount of $3,106,589.04 as of the date of the filing of the bankruptcy petition in this case. Wells Fargo claims that this is a secured claim and that the value of the collateral securing this claim substantially exceeds the amount of the claim. Accordingly, Wells Fargo claims that it is entitled to interest on its claim against the Debtor from and after the date on which this bankruptcy case was filed.

10.     On February 17, 2011, Wells Fargo advised Tiburon Pointe that the total amount due and owning from the Tiburon Pointe on that date on its loan to Wells Fargo was $3,273,316.35. This amount included principal in the amount of $2,597,823.83, interest in the amount of $23,468.11, default interest of $251,844.59, yield maintenance premium or pre-payment penalty of $286,137.73, late fees of $18,733.51, legal fees of $75,000.00, service fees of $117,097.96 and other miscellaneous loan fees and expenses, less reserves held by Wells Fargo.

11.     Through counsel, Tiburon Pointe disputed the claim of Wells Fargo and engaged in negotiations with Wells Fargo to resolve this dispute. As a result of these negotiations, Wells Fargo agreed to release Tiburon Pointe from all claims and liens which it holds against it and its

property provided it is paid $2,825,572.50 from the proceeds of the sale of the Tiburon Pointe apartment complex. This amount consists of principal and interest due on the loan as noted above plus an additional $210,000.00 to compromise and settle the remaining amount of its claim against the Debtor. This agreement by Wells Fargo, however, is only enforceable if the sale of the apartment complex closes on or before June 11, 2011. Installment payments on the indebtedness made to Wells Fargo by Tiburon Pointe from and after the filing of this motion will result in a corresponding decrease in this settlement amount

12.    On June 8, 2010, Midland filed a Proof of Claim in the Tiburon View bankruptcy case wherein Midland stated that it held a claim against the Debtor in the total amount of $2,970,506.48 as of the date of the filing of the bankruptcy petition in this case. Midland claims that this is a secured claim and that the value of the collateral securing this claim substantially exceeds the amount of the claim. Accordingly, Midland claims that it is entitled to interest on its claim against the Debtor from and after the filing of this bankruptcy.

13.    On February 24, 2011, Midland advised the Debtor that the total amount due on the loan as of March 11, 2011 (not including any pre-payment penalty) would be $2,810,466.83. This amount included principal due on the loan in the amount of $2,528,665.01 along with an additional $281,801.82 in loans fees and expenses including $46,850.72 in interest, $163,495.56 in default interest, $17,790.76 in late fees, $22,508.19 in escrow payments, and other miscellaneous loan fees and expenses.

14.    Through counsel, the Debtor disputed the claim of Midland and engaged in negotiations with Midland to resolve this dispute. As a result of these negotiations, Midland agreed to release Tiburon View from all claims and liens which it holds against Tiburon View and its property on the condition that it is paid $2,685,000.00 from the proceeds of the sale of the

Tiburon View apartment complex.  Installment payments on the indebtedness made to Midland by Tiburon View from and after the filing of this motion will result in a corresponding decrease in this settlement amount

15.   After evaluating various strategic alternatives the Debtor has concluded that the best mechanism for maximizing the value of the Debtors assets on a going concern basis is through the sale of its assets pursuant to 11 U.S.C. § 363.

16.   Therefore, the Debtor submits that it is in the estate's best interest to sell substantially all of the Debtors' assets to the Elkco pursuant to the terms of Exhibit A.  The sale will provide the best economic opportunity: (a) to realize the value of the assets, (b) to pay all creditors either the full amount of their claims or the amount which they have agreed to accept as full satisfaction of their claims, and (c) to provide a return to equity interest holders.

## C.   Assets To Be Sold

17.   As is more fully set forth in the Agreement, the Debtor proposes to offer the following assets for sale (the "Sale Assets")[1]:

> (a)   All buildings and improvements owned by Seller and any and all of Seller's rights, easements, licenses and privileges presently thereon or appertaining thereto;
>
> (b)   Seller's right, title and interest in and to all leases affecting the Tiburon View apartment complex;
>
> (c)   All furniture, furnishings, fixtures, equipment, tools and other tangible property owned by Seller and located on the Tiburon View apartment complex or used solely in connection therewith;
>
> (d)   All right, title and interest of Seller under maintenance, service,

advertising and other like contracts and agreements with respect to the

ownership and operation of the Tiburon View apartment complex, all to

the extent applicable to the period from and after the Closing; and

(e)     All right, title and interest of Seller in and to all names and marks used in

connection with the Tiburon View Apartment Complex.

18.     All of the assets of Seller not specifically identified under Exhibit A are excluded

from the proposed sale to Elkco.

**D.     The Commercial Purchase Agreement**

19.     Pursuant to the Commercial Purchase Agreement, upon the ultimate approval by

this Court and the satisfaction of conditions to obligations of the Debtor and the Buyer set forth

in the Agreement, the Debtor will sell the Sale Assets free and clear of all liens, claims, interests

and encumbrances.  The purchase price to be paid by Elkco is $7,950,000.00 (see paragraphs 1.1

through 1.4 of the Commercial Purchase Agreement) subject to the terms and adjustments as

provided in the Commercial Purchase Agreement.

**Debtor's Unexpired Leases and Executory Contracts**

20.     As of the filing date, the Debtor was a party to various executory contracts and

unexpired leases "Executory Contracts/Leases".  As part of the sale of the Sale Assets, the

Debtor seeks authority to assume and assign certain of those Executory Contracts/Leases to

Elkco.  A summary of the Executory Contracts/Leases is attached hereto as Exhibit B.

**Applicable Authority to Approve the Sale**

**A.     The Sale Should be Authorized Pursuant to Section 363(b)(1).**

21.     Section 363(b)(1) of the Bankruptcy Code provides: "[t]he Trustee, after notice

and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of

the estate." 11 U.S.C. § 363(b). Section 105(a) of the Bankruptcy Code provides in relevant part: "The Court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."

22.    A sale of substantially all of the debtor's assets should be authorized pursuant to section 363 of the Bankruptcy Code if a sound business purpose exists for doing so. *See, e.g., In re Schipper*, 933 F.2d 513, 515 (7th Cir. 1991); *In re Lionel Corp.*, 722 F.2d 1063, 1070 (2d Cir. 1983); *In re Channel One Communications, Inc.,* 117 BR 493 (Bankr. ED Mo. 1990); *In re Telesphere Communications, Inc.*, 179 B.R. 544, 552 (Bankr. N.D. Ill. 1994).

23.    As explained above, the Debtor has sound business justification for selling substantially all of its assets at this time. After over nine months of actively marketing the Tiburon View and Tiburon Pointe apartment complexes, the Debtor has obtained a good faith offer for the purchase of the apartment complex for a price that is significantly more that other offers the Debtors have received for the apartment complexes. The Debtor also believes that the current market provides the best opportunity for the Debtor to receive the highest value from the sale of the apartment complexes.

Additionally, since the outset of this case, Mr. Bidne, who is a minority interest holders in the Debtor, has actively resisted the continued management of the Debtor by Fisher Corporation and its president Todd Fisher. Other interest holders in the Debtor support the continued management of the Debtor by Fisher Corporation and Todd Fisher. It appears likely that these disputes will continue in the future and possibly even if a Chapter 11 Plan is confirmed and the Debtor continues to operate the Tiburon Pointe apartment complex thereafter.

24.     The Debtor therefore has determined, based upon its business judgment, that the most viable option for maximizing the value to the bankruptcy estates is through a sale of substantially the assets of the Debtors.

.25.     The Debtor submits that Exhibit A represents the highest and best offer for the Sale Assets and the consideration to be paid thereunder is fair and reasonable.  Any doubt as to the reasonableness of the purchase price is dispelled by the fact that the marketing of the apartment complex has been subject to competing bids, thereby enhancing the Debtor's ability to receive the highest and best offer for the Sale Assets.   Consequently, the fairness and reasonableness of the consideration to be received by the bankruptcy estate ultimately has been and will be demonstrated by a "market check", which is the best means of ensuring that a fair and reasonable price is being paid.  Under the circumstances, the Debtor submits that the Sale is the result of good faith arm's-length negotiations and the buyer should be entitled to all of the protections of section 363(m) of the Bankruptcy Code.

26.     The final element for the approval of a sale under section 363 of the Bankruptcy Code is the requirement that interested parties receive adequate notice.  Notice of the Sale will have been given as allowed by the Bankruptcy Court.  Such notice is reasonably calculated to provide timely and adequate notice to the Debtor's major creditor constituencies, those parties most interested in these cases, and, accordingly, is sufficient for entry of an Order Approving Sale. The Sale thus satisfies all of the requisite conditions for authorization under section 363(b) of the Bankruptcy Code.

**B.     The Sale Satisfies the Requirements of 11 U.S.C. § 363(f) for a Sale Free and Clear Of Liens, Claims, Encumbrances and Interests.**

27.     11 U.S.C. § 363(f) of the Bankruptcy Code provides the following:

The Debtor-in-Possession may sell property under subsection (b) or (c) of this section free and clear of any interest in such property of an entity other than the estate, only if --

(i)    applicable nonbankruptcy law permits sale of such property free and clear of such interest;

(ii)    such entity consents;

(iii)    such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

(iv)    such interest is in bona fide dispute; or

(v)    such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

28.    Therefore, pursuant to section 363(f), the Debtor-in-Possession may sell the Debtors' assets, including the Sale Assets, free and clear of all liens, claims, encumbrances. Each lien, claim or encumbrance satisfies at least one of the five conditions of section 363(f), and the Debtor submits that any such lien, claim or encumbrance will be adequately protected by direct payment from the sale proceeds, or by attachment to the net proceeds of the Sale, subject to any claims and defenses the Debtor may possess for the benefit of the bankruptcy estate with respect thereto. Accordingly, the Debtor requests that the Sale Assets be transferred to the buyer, free and clear of all liens, claims and encumbrances with such liens, claims and encumbrances to attach to the proceeds of the Sale.

**C.    A Finding of Good Faith of the Buyer Pursuant to Section 363(m) is appropriate.**

29.    Section 363(m) of the Bankruptcy Code provides the following:

The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such

authorization to an entity that purchased or leased such property in good faith, whether or not

such entity knew of the pendency of the appeal, unless such authorization and such sale or lease

were stayed pending appeal.  11 U.S.C. § 363(m).  While the Bankruptcy Court does not define

"good faith," the Seventh Circuit in *In the Matter of Andy Frain Services, Inc.*, 798 F.2d 1113

(7th Cir. 1986) held that:

> The requirement that a purchaser act in good faith . . . speaks to the integrity of his
> conduct in the course of the sale proceedings.  Typically, the misconduct that would destroy a
> purchaser's good faith status at a judicial sale involves fraud, collusion between the purchaser
> and other bidders or the trustee, or an attempt to    take grossly unfair advantage of other
> bidders.  798 F.2d at 1125 (emphasis omitted)(quoting *In re Rock Industries Machinery Corp.*,

572 F.2d 1195, 1198 (7th Cir. 1978).  The Debtor submits, and will present evidence at the Sale

Hearing, that as set forth above, the Agreement is an arm's-length transaction, in which the buyer

has at all times acted in good faith.  The Debtor, therefore, requests that the Court make a finding

that the buyer has purchased the Sale Assets and assumed the Assumed Contracts in good faith

within the meaning of section 363(m) of the Bankruptcy Code.

**D.    The Assumption and Assignment of Executory Contracts/Leases Should be**
**Authorized.**

30.    To enhance the value of the Sale to the bankruptcy estate, the Debtor requests

approval under 11 U.S.C. § 365 of the Debtors' assumption and assignment of Assumed

Contracts/Leases.  The Debtor further requests that the order approving the sale provide that the

Assumed Contracts/Leases will be transferred to, and remain in full force and effect for the

benefit of the Buyer notwithstanding any provisions in the Assumed Contracts/Leases, including

those described in Sections 365(b)(2) and (f)(1) and (3) of the Bankruptcy Code the prohibit such assignment.

Section 365(f)(2) of the Bankruptcy Code provides, in pertinent part, that:
The trustee may assign an executory contract or unexpired lease of the debtor only if –

    (A)    the trustee assumes such contract or lease in accordance with the provisions of this section; and

    (B)    adequate assurance of future performance by the assignee of such contract or lease is provided, whether or not there has been a default in such contract or lease.

11 U.S.C. § 365(f)(2).   Under Section 365(a), the Trustee or Debtor-in-Possession, "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a).   Section 365(b)(1), in turn, codifies the requirements for assuming an executory contract or unexpired lease of a debtor, providing that:

(b)(1)   if there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee –

    (A)    cures, or provides adequate assurance that the trustee will promptly cure, such default;

    (B)    compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and

(C)      provides adequate assurance of future performance under

such contract or lease.

11 U.S.C. § 365(b)(1).

31.    The meaning of "adequate assurance of future performance" depends on the facts

and circumstances of each case, but should be given a "practical, pragmatic construction." *See*,

*e.g.*, *EBG Midtown South Corp. v. McLaren/Hart Env. Engineering Corp. (In re Sanshoe*

*Worldwide Corp.)*, 139 B.R. 585, 592 (S.D.N.Y. 1992).

32.    Among other things, adequate assurance may be provided by demonstrating the

assignee's financial health and experience in managing the type of enterprise or property

assigned. *See*, *e.g.*, *In re Bygaph, Inc.*, 56 B.R. 596, 605-06 (Bankr. S.D. N.Y. 1986).

33.    The Debtor will present facts at the Sale Hearing to show the financial credibility,

the willingness, and the ability of the buyer to perform under the Assigned Rights and the

Assigned Contracts.  The Sale hearing thus will provide the Court and other interested parties the

opportunity to evaluate the ability of the Buyer to provide adequate assurance of future

performance under the assigned Contracts/Leases, as required under 11 U.S.C.§ 365(b)(1)(C).

Accordingly, the Court should authorize the Debtor to assume and assign the Executory

Contracts and Leases to the Buyer.

**ADEQUATE NOTICE**

34.    The Debtor will provide notice of the hearing on this Motion to (i) all entities

known to have asserted any lien, claim, interest or encumbrance in or upon the Sale Assets; (ii)

all federal, state, and local regulatory or taxing authorities or recording offices which have a

reasonably known interest in the relief requested by the Motion; (iii) the United States Trustee's

office; (iv) the Internal Revenue Service; (v) Elkco and (v) all entities on the Service list for this case including all creditors and parties-in-interest.

**WHEREFORE**, the Debtor respectfully requests that this Court enter an Order which:

(i)       approves the Sale of the Debtor's property as set forth herein;

(ii)     grants the Debtor's motion to assume and assign leases,

(iii)    approves of the payment of $2,825,572.50 to Wells Fargo directly from the proceeds of the proposed sale in full satisfaction of its claims against the Debtor;

(iv)    approves of the payment of $2,685,000.00 to Midland Loan Services directly from the proceeds of the proposed sale in full satisfaction of its claims against the Debtor;

(v)     approves of the payment of the remaining proceeds from the proposed sale into a separate, interest bearing, debtor-in-possession bank account and further provides that such funds shall remain in such account until the Court approves of the distribution of such funds after notice to all creditors and parties-in-interest;

(vi)    provides that all liens on the property to be sold will attach to the proceeds of the sale; and

vii.)    grants such other relief as is just and equitable.

Dated: April 4, 2011.

Respectfully submitted:

TIBURON POINTE APARTMENTS, L.L.C., Debtor

By:_____

    Sam King, NE # 19943
    MCGILL, GOTSDINER, WORKMAN &
      LEPP, P.C., L.L.O
    11404 West Dodge Road Suite 500
    Omaha, NE 68154-2584
    (402) 492-9200
    Facsimile:  (402) 492-9222
    Attorney for Debtor

## COMMERCIAL PURCHASE AGREEMENT

THIS COMMERCIAL PURCHASE AGREEMENT ("Agreement") is entered into as of this ____ day of February, 2011 ("Effective Date"), by and between TIBURON VIEW LTD., a Nebraska limited partnership ("Tiburon View") and TIBURON POINTE LTD_____,a Nebraska limited partnership ("Tiburon Point").   Tiburon View and Tiburon Point are collectively referred to herein as "Seller" and ELKCO PROPERTIES, INC., a Colorado corporation, or its assignee ("Buyer").

NOW, THEREFORE WITNESSETH: That for and in consideration of mutual covenants and agreements hereinafter set forth, Seller and Buyer hereby agree as follows:

### RECITALS

A.   Seller is the owner of certain parcels of real estate (collectively the "Land") located at 16895 Oakmont Drive, in the City of Omaha, County of Sarpy, State of Nebraska, which parcels are more particularly described in attached Exhibit "A", and upon which a multi-family residential apartment community commonly known as "Tiburon Apartments" is located; and

B.   Buyer desires to purchase and Seller has agreed to sell such Land, together with: (i) all buildings and improvements owned by Seller and any and all of Seller's rights, easements, licenses and privileges presently thereon or appertaining thereto; (ii) Seller's right, title and interest in and to all leases ("Leases") affecting the Property (as such term is hereinafter defined); (iii) all furniture, furnishings, fixtures, equipment, tools and other tangible property (collectively, the "Personal Property") owned by Seller and located on the Property or used solely in connection therewith; (iv) all right, title and interest of Seller under maintenance, service, advertising and other like contracts and agreements with respect to the ownership and operation of the Property (collectively, the "Service Contracts"), all to the extent applicable to the period from and after the Closing; and (v) all right, title and interest of Seller in and to all names and marks used in connection with the Property. The items in (i) through (v) above together with the Land are collectively referred to in this Agreement as the "Property".   All of the foregoing expressly excludes all property owned by tenants or other users or occupants of the Property; and

C.   Buyer has agreed to pay to Seller the Purchase Price (as hereinafter defined) for the Property, and Seller has agreed to sell the Property to Buyer, on the terms and conditions set forth below; and

D.   Buyer intends to make investigations regarding the Property, and Buyer's intended uses of the Property, as Buyer deems necessary and desirable.

1.   **Purchase Price:** Buyer agrees to pay the sum of Seven Million Nine Hundred Fifty Thousand Dollars ($7,950,000.00) ("Purchase Price") on the following terms:

1



EXHIBIT

A

**1.1.** Within three (3) business days following the Title Company's written receipt of a fully executed counterpart of this Agreement, the sum of Twenty-five Thousand Dollars ($25,000.00), as an earnest money deposit ("EMD"), shall be deposited in an interest bearing account with earnings accruing to Buyer, with First American Heritage Title Company, Attn: Ms. Mej Ellsworth 1600 Stout Street, Denver, Colorado  80202 ("Escrow Agent" and/or "Title Company"); and

**1.2** An additional Twelve Thousand Five Hundred Dollars ($12,500.00) in good funds shall be paid to Title Company, as escrow agent, within two (2) days following the expiration of the Physical Inspection Approval Period, as defined in Section 3 below, which additional funds shall be considered to be part of the EMD, and which shall be refundable or nonrefundable in accordance with the applicable provisions of this Agreement; and

**1.3** An additional Twelve Thousand Five Hundred Dollars ($12,500.00) in good funds shall be paid to Title Company, as escrow agent, within two (2) days following the expiration of the Financing Approval Period, as defined in Section 6a below (provided that Buyer has not elected to terminate this Agreement during the Physical Inspection Approval Period), which additional funds shall be considered to be part of the EMD, and which shall be refundable or nonrefundable in accordance with the applicable provisions of this Agreement; and

**1.4.** The balance of the Purchase Price, subject to applicable prorations, shall be paid in cash, by wire transfer or cashiers or certified check at Closing (hereinafter defined) to the Escrow Agent for delivery to Seller.

**2.** **Assessments**: Seller agrees to pay any assessments for public improvements previously constructed, or ordered or required to be constructed by the public authority, but not yet assessed.  In this connection, Seller states that Seller has no actual knowledge of any public improvements contemplated, ordered or required to be constructed, but not yet constructed.

**3.** **Inspection**: Buyer shall have a period of time commencing on the Effective Date and ending at 5:00 p.m. (Central Daylight Time) on the twentieth (20th) business day thereafter to make a complete inspection and evaluation of the Property, including all matters relating to the physical and financial information regarding the Property ("Physical Inspection Period") (subject to extension pursuant to Section 3.e), other than survey and environmental matters, which shall be subject to different evaluation periods as stated herein.  During the Physical Inspection Period, Buyer and its authorized agents, upon reasonable advance notice to Seller, may enter upon the Property for any lawful purpose, including to perform whatever inspections Buyer deems appropriate including, without limitation, tests, borings, studies, investigations, termite inspections and interviews of persons familiar with the Property and tests of structures, soils, utility lines and systems and for general hazards ("Physical Inspections").

a. In the event Buyer, in Buyer's sole discretion, finds the condition of the Property or any other matter related to the Property, including financial feasibility to be unacceptable, Buyer may elect, by written notice to Seller or Seller's agent on or before the expiration of the Physical Inspection Period, to terminate this Agreement. If Buyer desires to proceed with the purchase of the Property subject to the conditions set forth in this Agreement, then on or before the expiration of the Physical Inspection Period, Buyer shall deliver written notice to Seller or Seller's agent of such election to proceed

2

("Buyer's Physical Inspection Notice to Proceed"), electing to waive Buyer's right of termination pursuant to this Section 3.a and proceed with the Closing subject to the remaining conditions set forth in this Agreement. If Buyer fails to deliver Buyer's Physical Inspection Notice to Proceed to Seller or Seller's agent on or before the expiration of the Physical Inspection Period, then Buyer shall be deemed to have elected to terminate this Agreement. In the event of a termination pursuant to this Section 3.a, then (i) this Agreement shall be null and void, and (ii) Title Company is irrevocably instructed to return the EMD and all accrued interest to Buyer immediately.

b.      Buyer's right and time to object to title matters shall be governed by Sections 4, 8 and 9 below.

c.      No consent by Seller to any activity by Buyer related to Physical Inspections shall be deemed to constitute a waiver by Seller or assumption of liability or risk by Seller. Buyer hereby agrees to restore the Property to the same condition existing immediately prior to Buyer's exercise of its rights during the Physical Inspection Period at Buyer's sole cost and expense. The provisions of this Section 3 shall survive the Closing or termination of this Agreement.

d.      Seller shall, within three (3) business days after the Effective Date, deliver to Buyer the following:

    i.      Current rent roll showing, as of the most recent date, the name of each tenant, the amount of monthly rent, the amount of any security deposit, the unit number, the date through which rental is paid, the lease period and the lease initiation date;

    ii.     All tenant leases, including any modifications or amendments thereto;

    iii.    All licenses, permits, maps, certificates of occupancy, building inspection approvals and covenants, conditions and restrictions regarding the Property currently in Seller's possession or to which Seller has reasonable access;

    iv.     A list of all personal property owned or leased by Seller and used in connection with the operation of the Property;

    v.      All documents and contracts relating to any construction guarantees, warranties, as built drawings and signed plans in Seller's possession;

    vi.     All environmental investigations and studies, including "Phase Ones" prepared by or for Seller prior to the date of this Agreement;

    vii.    All service contracts, maintenance contracts, laundry and management contracts, commercial leases and warranties related to the Property ("Service Contracts");

    viii.   Any existing soils reports, surveys, appraisals, engineering and architectural studies or reports, termite reports, grading plans, topographical maps, and similar data related to the Property;

ix.      All books and records (in the form as maintained by Seller) and tax returns relating to capital improvements, operating income and expenses for the 2008, 2009 and 2010 calendar years;

x.      All insurance loss runs for the last five (5) years (to the extent in Seller's possession or available from Seller's insurance company);

xi.      2011 budget for the Property;

xii.      Copy of the most recent real property tax bill and personal property tax bill and most recent assessment from the taxing authority of the Property, together with copies of all property tax protests or appeals filed with respect to the Property;

xiii.      All termite or other pest reports with respect to the Property;

xiv.      Any bids for capital improvements to the Property need or anticipated; and

xv.      18 month historical occupancy report.

e. In the event that Seller does not deliver to Buyer the materials set forth in Sections 3.d (i – xv) in a timely manner as required by this Agreement, the Physical Inspection Period and the Financing Approval Period shall be extended day for day for each day Seller delivers the materials set forth in Sections 3.d (i – xv) to Buyer beyond the date required for delivery of such materials.

4.      **Environmental Inspection**: Buyer shall have a period of time commencing on the Effective Date and ending at 5:00 p.m. (Central Daylight Time) on the thirtieth (30th) calendar day thereafter to make a complete inspection and evaluation of the environmental aspects and condition of the Property that Buyer shall deem appropriate in its good faith discretion ("Environmental Inspection Period"). During the Environmental Inspection Period, Buyer and its authorized agents, upon reasonable advance notice to Seller, may enter upon the Property for any lawful purpose, including as required to perform whatever environmental inspections Buyer deems appropriate including, without limitation, tests, borings, studies, investigations and interviews of persons familiar with the Property ("Environmental Inspections").

a.      In the event Buyer, in Buyer's sole discretion, finds the results of the Environmental Inspections of the Property to be unacceptable, Buyer may elect, by written notice to Seller or Seller's agent on or before the expiration of the Environmental Inspection Period, to terminate this Agreement. If Buyer desires to proceed with the purchase of the Property subject to the other conditions set forth in this Agreement, then on or before the expiration of the Environmental Inspection Period, Buyer shall deliver written notice to Seller or Seller's agent of such election to proceed ("Buyer's Environmental Inspection Notice to Proceed"), electing to waive Buyer's right of termination pursuant to this Section 4.a and proceed with the Closing subject to the remaining conditions set forth in this Agreement. If Buyer fails to deliver Buyer's Environmental Inspection Notice to Proceed to Seller or Seller's agent on or before the expiration of the Environmental Inspection Period, then Buyer shall be deemed to have elected to terminate this Agreement. In the event of a termination pursuant to this Section 4.a, then (i) this Agreement shall be null and void, and (ii) Title Company is irrevocably

instructed to return the EMD and all accrued interest to Buyer immediately.

b.      No consent by Seller to any activity by Buyer related to Environmental Inspections shall be deemed to constitute a waiver by Seller or assumption of liability or risk by Seller. Buyer hereby agrees to restore the Property to the same condition existing immediately prior to Buyer's exercise of its rights during the Environmental Inspection Period at Buyer's sole cost and expense. The provisions of this Section 4 shall survive the Closing or termination of this Agreement.

5.      **Contingency for Seller Approval:** This Agreement, and the obligation of Seller to close a sale of the Property to Buyer, shall be conditional and contingent upon Seller obtaining such approval of this Agreement and consent of the United States Bankruptcy Court (the "Court") When Seller obtains the required consent of the Court, Seller shall send an email notification of such approval to Buyer and Buyer's legal counsel at the addresses specified in this Agreement below and have the Agreement signed by the Court below. If Seller is unable to obtain the required approval and consent on or before 5:00 p.m. Mountain Time, 19 business days following the Effective Date, this Agreement shall be null and void, whereupon the EMD and all accrued interest will be refunded to Buyer, this Agreement, and neither party will have any rights or obligations as against the other with respect to the subject matter of this Agreement.

6.      **Contingencies for Buyer Financing Approval:**

(a)  Buyer's obligation to close the purchase contemplated by this Agreement shall be contingent upon Buyer obtaining all approvals necessary for financing from a lender on terms and conditions satisfactory to Buyer, in its sole discretion, reviewing and approving the final documents relating to such financing and any other documents, instruments or agreements that are required to be delivered or executed by Buyer in conjunction with the financing and obtaining a loan policy of title insurance satisfactory to lender required in connection with the financing ("Financing Contingency") on or before 11:59 p.m. C.S.T on the thirty-fifth business day following the date the Court approves this Agreement (the "Financing Approval Period") (subject to extension pursuant to Section 3.e and this Section 6.a). In the event Buyer cannot for any reason fulfill the Financing Contingency prior to the expiration of the Financing Approval Period, in Buyer's sole discretion, Buyer shall have the right to terminate this Agreement by providing written notice of termination within one (1) business day after the expiration of the Financing Approval Period, and the provisions of Section 6.b below shall take effect as to the refund of the EMD to Buyer.

Notwithstanding the foregoing, if the Buyer's application to a lender for financing of the purchase of the Property has not been rejected on or before the expiration of the Financing Approval Period, Buyer may at its option extend the Financing Approval Period for one (1) additional thirty (30) business day period. Buyer may exercise such right by depositing with the Escrow Agent an Additional Deposit of Seven Thousand Five Hundred Dollars ($7,500.00) for such extension. Said Additional Deposit shall become part of the EMD and refundable according to this Agreement and shall be applied to the Purchase Price.

(b)  If Buyer is unable to fulfill the Financing Contingency prior to the expiration of the Financing Approval Period, and Buyer terminates this Agreement because of the same, the Title Company is irrevocably instructed to return the EMD to Buyer immediately, along with any interest thereon. Upon termination under this Section 6, and

disbursement of the EMD to Buyer, neither party shall have any further obligation under this Agreement, except as specifically set forth herein.

(c)    If Buyer fails to terminate this Agreement under the terms of Section 6.a above prior to the deadline, or effective as of the date that Buyer satisfies the Financing Contingency, then the full amount of the EMD (consisting of the sums paid under Sections 1.1, 1.2 and 1.3 above, and all accrued interest thereon, shall be deemed to be fully earned by Seller and nonrefundable to Buyer, except as otherwise provided in this Agreement. However, if Buyer then completes the Closing, the full amount of the EMD paid to Seller, and all accrued interest thereon, shall be applied against the Purchase Price. Notwithstanding the foregoing, if the Closing of the purchase of the Property fails to occur due the breach of this Agreement by Seller and Buyer terminates this Agreement due to such breach, Seller shall return the EMD and all accrued interest to Buyer.

7.    **Taxes:** All real estate taxes which become delinquent in the year in which Closing takes place shall be treated as though all are current taxes, and those taxes shall be prorated as of the date of closing, and all the prior years' taxes, interest, and other charges, if any, will be paid by Seller.

8.    **Closing Prorations; Leases and Service Contracts:**

a.    All normal and customarily proratable items, including, without limitation, rents (as defined below), operating expenses, personal property taxes, other operating expenses and fees, shall be prorated as of the Closing Date, Seller being charged or credited, as appropriate, for all of same attributable to the period up to and including the day immediately preceding the Closing Date (and credited for any amounts paid by Seller attributable to the period from and after the Closing Date) and Buyer being responsible for, and credited or charged, as the case may be, for all of same attributable to the period from and after the Closing Date. All security or other deposits under tenant leases, if any, reflected on the Closing Rent Roll (defined below) shall be transferred by Seller to Buyer at the Closing, or shall be credited to Buyer against the amount payable by Buyer at Closing, at Seller's option. Buyer shall assume at Closing the obligations under all of the Leases and Service Contracts unless Buyer elects to terminate any such Leases and Service Contracts which are terminable on or before Closing without penalty. For purposes hereof, rents shall include, without limitation, all rents or other charges or reimbursements of any nature which are payable by tenants. Rents and all related charges shall be prorated based on actual collections as of the Closing Date based on the actual number of days in the month that Closing occurs, with Buyer to have the day of Closing. If any of the items subject to proration hereunder cannot be prorated at the Closing because the information necessary to compute such proration is unavailable, or if any errors or omissions in computing prorations at the Closing are discovered subsequent to the Closing, then such item shall be reapportioned and such errors and omissions corrected as soon as practicable after the Closing Date and the proper party reimbursed, which obligation shall survive the Closing for a period (the "Proration Period") from the Closing Date until three (3) months after the Closing Date.

b.    After the date of this Agreement, and except as otherwise specifically set forth in this Agreement, Seller shall not execute any new Leases or Service Contracts

without the express prior written approval of Buyer in each instance. Such consent shall not be unreasonably withheld during the Physical Inspection Period, but may be withheld in Buyer's sole discretion after the Physical Inspection Period and prior to Closing. Seller shall give Buyer prompt written notice and provide copies of each such modification, amendment or new Lease or Service Contract, and all such new modifications, amendments, Leases and Service Contracts shall become "Leases" or, "Service Contracts" subject to this Agreement. Seller shall defend and indemnify Buyer from and against any and all suits, claims, losses and expenses arising prior to Closing under any Lease or Service Contract and incurred by Buyer. Notwithstanding the foregoing, Seller shall be entitled, at any time prior to Closing and without first obtaining the consent of Buyer, to enter into residential tenant leases for terms of up to one year, provided that such leases are entered into on Seller's usual lease form and at monthly rental rates that are consistent with Seller's rates quoted in the ordinary course of business.

9.    **Title**: Within five (5) calendar days from the Effective Date, Seller shall arrange for Title Company to issue and deliver to Buyer and Seller a preliminary title report or commitment ("Title Commitment") to issue an Owner's Policy of Title Insurance ("Title Policy") with standard preprinted exceptions deleted (except for the "survey" preprinted exception, unless Buyer elects to obtain a survey as provided in this Agreement and such survey is satisfactory to the Title Company so as to cause such preprinted exception to be deleted), insuring Buyer's fee simple title to the Property in Buyer, subject only to the Permitted Exceptions, in a face coverage amount equal to the Purchase Price, together with legible copies of the recorded documents listed as exceptions to title in the Title Commitment. If Buyer desires to obtain an ALTA extended coverage owner's policy, then Buyer shall comply with all reasonable requirements of the title company in connection therewith, which may include obtaining an updated survey (the "Updated Survey") at Buyer's and Seller's expense as set forth in Section 9.1.

9.1.    On or before the expiration of twenty (20) business days from the later of (a) Buyer's receipt of the Title Commitment and all documents constituting exceptions to title, and (b) Buyer's receipt of a copy of the exiting survey of the Property ("Existing Survey"), Buyer shall give written notice ("Objection Notice") to Seller of any conditions of title to which Buyer objects ("Objections") separately specifying and setting forth each of such Objections. If Buyer gives Seller an Objection Notice within the period set forth above, then all matters disclosed on the Title Commitment and the Existing Survey which are not objected to in such Objection Notice shall be deemed to be Permitted Exceptions. If Buyer fails to give Seller an Objection Notice within the period set forth above, then all matters disclosed on the Title Commitment and the Existing Survey shall be deemed to be Permitted Exceptions. Seller shall have five (5) days to elect to cure such items in the Objection Notice or elect to not cure such items in the Objection Notice. If Seller fails to respond to the Objection Notice, then Seller shall be deemed to have elected not to cure the items in the Objection Notice. Should Seller elect not to cure any item in the Objection Notice, Buyer shall have the right either to terminate this Agreement or withdraw its Objection Notice within two (2) business days after Seller's five (5) day review period. If Buyer elects to terminate this Agreement, the EMD shall be returned to Buyer. If Buyer elects to waive its Objection Notice, the Objections so waived by Buyer shall be deemed to be Permitted Exceptions. If Buyer elects to obtain an Updated Survey, Buyer will thereafter have five (5) calendar days after Buyer receives the Updated Survey within which to give written notice ("Supplemental Objection Notice") to Seller of any conditions of title that are shown in the Updated Survey, but that were not shown in the Existing Survey ("New Conditions"), to which Buyer objects ("Supplemental Objections") separately specifying and setting forth each New

Condition that is subject to such Supplemental Objections. If Buyer gives Seller a Supplemental Objection Notice within the period set forth above, then all New Conditions disclosed on the Updated Survey which are not objected to in such Objection Notice shall be deemed to be Permitted Exceptions. If Buyer fails to give Seller a Supplemental Objection Notice within the period set forth above, then all New Conditions disclosed on the Updated Survey shall be deemed to be Permitted Exceptions. Buyer and Seller shall share equally the cost of the Updated Survey, if any, provided, that if the cost of the Updated Survey exceeds $2,000.00 Buyer's portion of the payment shall be capped at $1,000.00 with Seller paying the difference.

　　　　9.2.　　　Seller shall, at Seller's sole cost and expense, prior to the expiration of the Financing Approval Period, satisfy any Objections and Supplemental Objections or provide to Buyer such endorsements to the Title Commitment as are necessary to delete any and all Objections and Supplemental Objections. If Seller fails to cure such Objections and Supplemental Objections, Buyer may elect as its sole remedy to: (a) immediately following the expiration of the Financing Approval Period terminate this Agreement with the EMD and all accrued interest being returned to Buyer as Buyer's sole remedy; or (b) accept such title as Seller can deliver, with no reduction in the Purchase Price other than with respect to liens which can be cured at Closing by the payment of money and which liens Buyer elects to so cure.

　　　　10.　　　**Closing and Escrow Closing; Conditions to Closing**: The Closing shall occur on or before the thirtieth (30th) calendar day, or the first business day thereafter if such thirtieth (30th) day is a Saturday, Sunday or federal holiday, from and after the date of the final commitment letter issued by Buyer's lender (**"Closing Date" or "Closing"**).

　　　　10.1　　　Buyer and Seller acknowledge and understand that the Escrow Agent will handle the Closing. Escrow Agent's charges for the escrow closing shall be equally divided between Buyer and Seller. Notwithstanding anything else to the contrary contained herein, this Agreement shall automatically be null and void and of no further force and effect unless the Closing occurs on or before the Closing Date, as specified herein above.

　　　　10.2　　　At or prior to the Closing, Seller shall execute and/or deliver the following to the Escrow Agent for the benefit of Buyer:

　　　　　　a.　　　Special Warranty Deed ("Deed").

　　　　　　b.　　　Bill of Sale and Assignment of Leases, Warranties and Service Contracts ("Bill of Sale").

　　　　　　c.　　　Keys to all locks and plans and specifications for the Property, if in the possession of Seller, which shall be delivered to Buyer's representative at the Property.

　　　　　　d.　　　A rent roll for the Property ("Closing Rent Roll") dated as of the Closing Date listing each tenant, the monthly base rent payable, lease expiration date, security deposit and reflecting any rent due at the time of Closing, together with the transfer of all security or other deposits received by Seller under tenant leases, if any, reflected on the Closing Rent Roll.

　　　　　　e.　　　Such other documents and instruments as may be required by this Agreement or by the Title Company or Buyer's lender in order to consummate the transactions described in this Agreement and to issue the Title Policy to Buyer, including, without limitation, an owner's affidavit.

　　　　　　f.　　　A non-foreign (FIRPTA) affidavit for Seller complying with the

8

requirements of Internal Revenue Code Section 1445(f)(3) and the regulations promulgated thereunder.

g.     Notice to Tenants related to transfer of ownership ("Notice").

h.     Such other instruments, affidavits and tax returns as are customarily executed by the seller of an interest in real property in connection with the recording of a deed.

i.     A certificate of Seller's duly authorized officer, certifying Seller's organizational documents and the resolutions of Seller authorizing the transaction contemplated by this Agreement

j.     A certificate dated as of the date of Closing certifying in such detail as Buyer may reasonably specify that Seller's representations and warranties contained in this Agreement or in any certificate or document delivered in connection with this Agreement or the transactions contemplated herein are true at and as of the Closing Date as though such representations and warranties were then again made and that Seller shall have performed its obligations under this Agreement that are to be performed prior to the Closing Date or identifying any exceptions thereto.

k.     Lead based paint disclosure form contained in the attached Exhibit "B".

**10.3**     At or prior to the Closing, Buyer shall execute and/or deliver the following to Seller:

a.     The balance of the Purchase Price set forth in Section 1.4 hereof.

b.     Such other documents and instruments as may be required in this Agreement or by the Title Company in order to consummate the transactions described in this Agreement.

c.     Such other instruments, affidavits and tax returns as are customarily executed by the Buyer of an interest in real property in connection with the recording of a deed.

**10.4**     Buyer shall not be obligated to close the transaction contemplated by this Agreement until all of the following conditions ("Conditions to Closing") have been waived by Buyer or fulfilled to Buyer's satisfaction:

a.     The Title Company shall commit at Closing to provide a title commitment to Buyer evidencing its agreement to issue the Title Policy to Buyer in accordance with all marked-up commitments within thirty (30) days after Closing;

b.     All representations, warranties and covenants of Seller set forth herein shall be true and correct as of the Closing Date; and

c.     All agreements and contingencies required to be performed or satisfied by Seller prior to or at the time of the Closing in connection with the transaction contemplated by this Agreement shall have been duly performed or complied with by Seller prior to or at such time or waived by Buyer.

Seller shall use its best efforts to satisfy all of the Conditions to Closing as soon as reasonably practicable. In the event that all of the Conditions to Closing are not satisfied or waived by Buyer on or before the Closing Date, Buyer shall have the right to terminate this

Agreement. In such event, Title Company is irrevocably instructed to return the EMD to Buyer immediately with no further release from Seller being necessary, and neither party shall have any further obligation under this Agreement except as specifically set forth herein.

      **11.**      **Transaction Costs:** Seller shall pay for the cost of (i) the base premium due in connection with the Title Policy, (ii) any documentary stamps and transfer taxes, (iii) one-half (1/2) of Escrow Agent's standard escrow fees; (iv) recording costs of documents releasing the non-Permitted Exceptions; (v) a portion of the cost of the Updated Survey as set forth in Section 9.1; and (vi) its attorney's fees. Buyer shall pay for the cost of (i) the cost of any additional endorsements and the additional cost of obtaining extended coverage to the Title Policy, (ii) the premium for the lender's title insurance policy, (iii) one-half (1/2) of Escrow Agent's standard escrow fees; (iv) a portion of the cost of the Updated Survey as set forth in Section 9.1; and (v) its attorney's fees.

      All other costs will be charged in a manner customary in the Omaha, Nebraska area.

      **12.**      **Insurance; Loss:**

      (a)      From the date of this Agreement until the Closing, Seller shall continue to maintain the Property and all other improvements in good condition and repair and promptly notify Buyer of the occurrence of any event known to it that materially affects the accessibility, value or utility of the Property. Any risk of loss to the Property shall be borne by Seller until title has been conveyed to Buyer.

      (b)      In the event the Property should be damaged by any casualty after the date of this Agreement and prior to Closing, Buyer may elect to terminate this Agreement by written notice to Seller on or before the expiration of the tenth (10th) business day following Buyer's receipt of written notice of such damage from Seller, in which case the Title Company is irrevocably instructed to return the EMD to Buyer immediately; and if the Buyer does not elect to terminate this Agreement, the Seller shall assign to Buyer, at Closing, all insurance proceeds payable for such damage, and Buyer shall receive a credit against the Purchase Price in the amount of any deductible required by Seller's insurance policies, and the sale shall be closed without the Seller's repairing such damage; provided however, Seller shall be obligated to make such emergency repairs as are necessary to prevent further damage to the Property or injury to any person thereon, and Seller may use insurance proceeds for this limited purpose, including being reimbursed at Closing by Buyer for the reasonable costs of any necessary emergency repairs if not theretofore reimbursed.

      (c)      In the event of a taking by condemnation or similar proceedings or actions of all of the Property, or any material (in Buyer's reasonable judgment) portion of the Property, Buyer shall have the option to terminate this Agreement upon written notice to Seller within five (5) business days after written notice thereof from Seller, in which case the Title Company is irrevocably instructed to return the Earnest Money to Buyer immediately. If Buyer does not exercise its option under the immediately preceding sentence of this Section to terminate this Agreement, then the Agreement shall remain in full force and effect and Seller shall assign or pay to Buyer at Closing, Seller's entire interest in and to any and all condemnation awards or proceeds from any such proceedings or actions in lieu thereof.

13. **Representations and Warranties:**

(a)  Seller warrants and represents to Buyer the following:

(i)  Seller has good and marketable title to the Property, free and clear of all liens, encumbrances, conditions, exceptions or reservations, except those of record;

(ii)  Seller has no actual knowledge of any condemnation, environmental, zoning or other environmental or land use regulation or proceeding, which would materially and adversely affect the Property;

(iii)  There is available legal ingress and egress to the Property from a publicly dedicated right of way or from an easement or similar right benefiting the Property;

(iv)  Seller is validly existing and in good standing under the laws of Seller's state of organization, and all documents, including this Agreement, executed or to be executed by Seller which are to be delivered to Buyer prior to or at Closing have been or will be duly authorized, executed, and delivered by Seller, and are or will be legal, valid, and binding obligations of Seller sufficient to convey title (if they purport to do so), and do not or will not violate any provisions of any agreement to which the Seller is a party or to which it is subject;

(v)  That, on the Closing Date, there will be no outstanding contracts made or authorized by Seller for the Property for work or services with respect to the Property, including professionals such as architects, surveyors, engineers and planners, which have not been fully paid for, except for the Leases and Service Contracts referenced above in this Agreement; and Seller shall cause to be discharged all mechanics or materialmen's liens arising from any labor or materials furnished to the Property prior to the Closing Date (other than resulting from any investigation or work undertaken by or on behalf of Buyer);

(vi)  That, to Seller's actual knowledge, there are no existing or pending special assessments, fees, or other obligations affecting the Property or any appurtenant property, including without limitation, impact fees, solid waste fees, reservation fees, aid in construction fees, utility connection fees, sewer or water assessments, fees for roadway and traffic improvements, or other developmental obligations which may be assessed by any governmental or quasi-governmental authority, water or sewer authority, solid waste authority, drainage district, street lighting district, or any other special taxing district, nor does Seller have any knowledge of any pending or proposed assessment for public improvements which might result in such being contemplated. Seller shall be liable for any assessments affecting the Property that are certified, confirmed, or ratified prior to the Closing Date;

(vii)  That except as otherwise set forth in this Agreement, Seller has entered

11

into no other contracts for the sale or lease of, nor given any option to purchase or lease, all or any portion of the Property; nor has Seller entered into any contracts, leases or use agreements with respect to any portion of the Property which will survive the Closing except as otherwise permitted pursuant to the terms of this Agreement, and Seller shall not do any of the foregoing prior to Closing without the express written consent of Buyer in every instance;

(viii)   That, to Seller's actual knowledge, there are no patent or latent defects in the construction of the buildings on the Property or in the soils under the Property, and, to the best of Seller's actual knowledge, the Property has never been used for, and shall not be used prior to Closing as, a landfill, dump site, underground improvements, storage of hazardous or regulated substances, or by a manufacturer of any product or for any other industrial use, nor, to Seller's actual knowledge, is the Property subject to any wetlands or other environmental limitation;

(ix)   That the Leases made available for Buyer's review are the only Leases affecting the Property and, to Seller's actual knowledge, there are no defaults or no facts which, with the passage of time or the giving of notice, would result in defaults thereunder. In addition, Seller represents that no rents have been prepaid more than one month in advance thereunder.  Seller will not modify, terminate or accept any prepayments under the Leases unless Buyer consents thereto in advance in writing in each instance. Additionally, other than residential leases entered into in accordance with Seller's usual and customary terms and qualification standards, Seller will not enter into any new Leases prior to Closing without the prior written consent of Buyer in each instance in accordance with the terms of this Agreement; and

(x)   That the Personal Property is all the Personal Property owned by Seller and located on the Property or used in connection therewith, and that Seller shall maintain all such Personal Property and bear the risk of loss prior to Closing and that all such Personal Property shall exist as of the Closing Date.

(b)   Buyer warrants and represents to Seller that Buyer is a corporation validly existing and in good standing under the laws of the State of Colorado, and all documents, including this Agreement, executed or to be executed by Buyer, which are to be delivered to Seller prior to or at Closing, have been or will be duly authorized, executed and delivered by Buyer and are or will be legal, valid and binding obligations of Buyer, and will not violate any provisions of any agreement to which Buyer is a party or to which it is subject; and that Buyer has full right, power and authority, without the necessity, consent or approval of any other person or entity, to enter into this Agreement and perform its obligations hereunder.

**14.   Brokers.** Buyer has not been represented by a broker under a written agreement between Buyer and a broker in connection with the sale contemplated by this Agreement. Seller has been represented by PJ Morgan Real Estate Company, a broker, in connection with the sale

12

contemplated by this Agreement. Seller shall pay a brokerage commission to PJ Morgan Real Estate Company pursuant to the written agreement between Seller and such broker.

**15.    Assignability:** Buyer may assign its interest in this Agreement to (a) any other person or entity in which Stephen F. Elken is a principal, without the prior written approval of Seller, or (b) any other person or entity, with the prior written approval of Seller, which shall not be unreasonably withheld or delayed, provided that Seller is satisfied as to the financial ability of such assignee to perform the obligations of Buyer under this Agreement.

**16.    Binding Effect:** This Agreement shall be binding upon and inure to the benefit of Seller and Buyer, and their respective successors, heirs and permitted assigns.

**17.    Captions:** The captions, headings, and arrangements used in this Agreement are for convenience only and do not in any way affect, limit, amplify, or modify the terms and provisions hereof.

**18.    Notices:** All notices, demands, requests and other communications required pursuant to the provisions of this Agreement ("Notice") shall be in writing and shall be deemed to have been properly given or served for all purposes (i) if sent by Federal Express or a nationally recognized overnight carrier for next business day delivery, on the first business day following deposit of such Notice with such carrier, or (ii) if personally delivered, on the actual date of delivery or (iii) if sent by certified mail, return receipt requested postage prepaid, on the second (2nd) business day following the date of mailing, or (iv)  if sent by telecopier, then on the actual date of delivery (as evidenced by a telecopier confirmation) provided that a copy of the telecopy and confirmation is also sent the same day by certified mail, return receipt requested postage prepaid, addressed as follows:

If to Seller: Attn: Mr. Sam King
    McGill, Gotsdiner, Workman & Lepp. P.C., L.L.O.
    11404 West Dodge Road, Suite 500
    Omaha, Nebraska  68154-2576
    Phone: (402) 492-9200
    Fax: (402) 492-9222
    Email Address:samking@mgwl.com

With a copy to PJ Morgan Real Estate
    Attn: PJ Morgan
    7801 Wakeley Plaza
    Omaha, Nebraska  68114
    Phone: (402) 397-7775
    Fax: (402) 397-6065
    Email Address: pmorgan@pjmorgan.com

If to Buyer: Attn: Stephen F. Elken
    1873 South Bellaire Street, Suite 1105
    Denver, Colorado 80210
    Phone: (303) 778-0380
    Fax: (303) 778-0299
    Email Address: steve@elkco.net

With a copy to: Berenbaum, Weinshienk & Eason, P.C.
Attn: Kenneth S. Kramer, Esq.
370 Seventeenth Street, Suite 4800
Denver, Colorado 80202
Phone: (303) 592-8353
Fax: (303) 629-7610
Email Address: kskramer@bw-legal.com

Any of the parties may designate a change of address by Notice in writing to the other parties. Whenever in this Agreement the giving of Notice by mail or otherwise is required, the giving of such Notice may be waived in writing by the person or persons entitled to receive such Notice.

**19.    Governing Law and Venue:** The laws of the State of Nebraska shall govern the validity, construction, enforcement, and interpretation of this Agreement, unless otherwise specified herein except for the conflict of laws provisions thereof. All claims, disputes and other matters in question arising out of or relating to this Agreement, or the breach thereof, shall be decided by proceedings instituted and litigated in Omaha, Sarpy County, Nebraska and the parties hereto expressly consent to the venue and jurisdiction of such court.

**20.    Entirety and Amendments:** This Agreement embodies the entire Agreement between the parties and supersedes all prior Agreements and understandings, if any, relating to the Property, and may be amended or supplemented only by an instrument in writing executed by the party against whom enforcement is sought.

**21.    Severability:** If any provision of this Agreement is held to be illegal, invalid, or unenforceable under present or future laws, such provision shall be fully severable. The Agreement shall be construed and enforced as if such illegal, invalid, or unenforceable provision had never comprised a part of this Agreement; and the remaining provisions of this Agreement shall remain in full force and effect and shall not be affected by the illegal, invalid, or unenforceable provision or by its severance from this Agreement. In lieu of such illegal, invalid, or unenforceable provision, there shall be added automatically as a part of this Agreement a provision as similar in terms to such illegal, invalid, or unenforceable provision as may be possible to make such provision legal, valid, and enforceable.

**22.    Multiple Counterparts:** This Agreement may be executed in a number of identical counterparts. If so executed, each of such counterparts is to be deemed an original for all purposes and all such counterparts shall, collectively, constitute one Agreement. In making proof of this Agreement, it shall not be necessary to produce or account for more than one such counterpart. Furthermore, the parties shall have the right to execute this Agreement and deliver to the other by facsimile transmission or by email a true and complete copy containing such signature, which shall be deemed to be as effective as delivery of an executed document containing an original signature.

**23.    Further Acts:** In addition to the acts and deeds recited herein and contemplated and performed, executed and/or delivered by Seller and Buyer, Seller and Buyer agree to perform, execute and/or deliver or cause to be performed, executed and/or delivered any and all such further acts, deeds, and assurances as may be necessary to consummate the transactions contemplated hereby.

14

24.    **Construction:** No provision of this Agreement shall be construed in favor of, or against, any particular party by reason of any presumption with respect to the drafting of this Agreement; both parties, being represented by counsel, having fully participated in the negotiation of this instrument.

25.    **Intentionally Omitted.**

26.    **Time of the Essence:** It is expressly agreed by the parties hereto that time is of the essence with respect to this Agreement.

27.    **Default and Remedies:**

27.1.    In the event either party is in default of any provision hereof, the non-defaulting party, as a condition precedent to its remedies, must give the defaulting party and the Title Company written notice of the default in strict accordance with the notice requirements of Section 16. Except as otherwise provided in this Agreement, the defaulting party shall have ten (10) business days from receipt of such notice to cure the default. If the default is timely cured, this Agreement shall continue in full force and effect. If the default is not timely cured, the non-defaulting party may pursue its applicable remedies set forth in Sections 27.2 and 27.3.

27.2.    If Buyer is in default hereunder beyond any applicable notice and cure periods, then Seller shall have the right, as its sole and exclusive remedy, to terminate this Agreement by giving Buyer and the Escrow Agent written notice thereof and, upon receipt of such notice the Escrow Agent shall deliver the EMD and all accrued interest to Seller.

27.3.    If Seller is in default hereunder beyond any applicable notice and cure periods, Buyer shall be entitled, as its exclusive remedy, to elect either (a) to terminate this Agreement by giving Buyer and the Escrow Agent written notice thereof and, upon receipt of such notice the Escrow Agent shall deliver the EMD and all accrued interest to Buyer, or (b) to enforce specific performance of Seller's obligations under this Agreement.

28.    **Cumulative Remedies And Waiver:** No remedy herein conferred or reserved is intended to be exclusive of any other available remedy or remedies herein conferred or referred, but each and every such remedy shall be cumulative and shall be in addition to every other remedy given under this Agreement. No delay or omission to exercise any right or power accruing upon any default, omission, or failure of performance hereunder shall impair any right or power or shall be construed to be a waiver thereof, but any such right and power may be exercised from time to time and as often as may be deemed expedient. No waiver, amendment, release, or modification of this Agreement shall be established by conduct, custom, or course of dealing.

29.    **Litigation Expenses:** In the event either party hereto commences litigation against the other to enforce its rights hereunder, each party in such litigation shall be obligated to pay its own fees and expenses incidental to such litigation.

30.    **Time Periods:** Except as specifically provided for herein to the contrary, should the last day of a time period fall on a weekend or legal holiday, the next business day thereafter

15

shall be considered the end of the time period.

**31.    Exchange:**

**31.1.**    At Seller's sole cost and expense, Seller may structure the sale of the Property to Buyer as a like kind exchange under Internal Revenue Code Section 1031 ("Seller's Like Kind Exchange") whereby Seller will acquire certain property in conjunction with the sale of the Property. Buyer shall cooperate with Seller's conduct of Seller's Like Kind Exchange, provided that all costs and expenses generated in connection with Seller's Like Kind Exchange shall be borne solely by Seller, and Buyer shall not be required to take title to or contract for the purchase of any other property. If Seller uses a qualified intermediary to effectuate Seller's Like Kind Exchange, any assignment of the rights or obligations of Seller hereunder shall not relieve, release or absolve Seller of its obligations to Buyer. In no event shall Seller's Like Kind Exchange delay the Closing Date. Seller shall indemnify and hold harmless Buyer from and against any and all liability arising from and out of Seller's Like Kind Exchange.

**31.2.**    At Buyer's sole cost and expense, Buyer may structure the purchase of the Property from Seller as a like kind exchange under Internal Revenue Code Section 1031 ("Buyer's Like Kind Exchange") whereby Buyer will sell certain property in conjunction with the purchase of the Property. Seller shall cooperate with Buyer's conduct of Buyer's Like Kind Exchange, provided that all costs and expenses generated in connection with Buyer's Like Kind Exchange shall be borne solely by Buyer, and Seller shall not be required to take title to or contract for the purchase or sale of any other property. If Buyer uses a qualified intermediary to effectuate Buyer's Like Kind Exchange, any assignment of the rights or obligations of Buyer hereunder shall not relieve, release or absolve Buyer of its obligations to Seller. In no event shall Buyer's Like Kind Exchange delay the Closing Date. Buyer shall indemnify and hold harmless Seller from and against any and all liability arising from and out of Buyer's Like Kind Exchange.

**32.    Agreement as Offer:**  This Agreement shall constitute an offer by Buyer and shall expire and be deemed revoked unless accepted in writing by Seller, as evidenced by their signatures below and Buyer receives notice of such acceptance pursuant to Section 18 on or before the end of the day, February 24, 2011, provided that in the event that the Seller does not accept this offer on or before February 24, 2011, the offer shall remain open until 5:00 p.m. MST February 28, 2011 to enable Buyer and Seller to attempt, in good faith, to arrive at an agreement and execute a contract.

[Remainder of Page Left Blank]

NOW WHEREFORE, the parties hereto have executed this Agreement to be effective as of the date first written above.

SELLER:

TIBURON VIEW LTD., a Nebraska limited partnership,

By:_____

Name:_____

Title:_____

Dated: February \_\_\_, 2011.


TIBURON POINTE LTD., a Nebraska limited partnership,

By:_____

Name:_____

Title:_____

Dated: February \_\_\_, 2011.


ELKCO PROPERTIES, INC., a Colorado corporation, Buyer

By:_____
      Stephen F. Elken, President

Dated: February \_\_\_, 2011.


APPROVAL OF COURT

The undersigned has reviewed the foregoing Commercial Purchase Agreement and hereby approves the same. If necessary, the Receiver shall provide all documents in his possession to Buyer which are required to be provided to Buyer pursuant to the Commercial Purchase Agreement.


_____
U.S. Bankruptcy Court Judge


17

## EXHIBIT "A"

## LEGAL DESCRIPTION

### Parcel 1

Lot 2 Ballena Replat I, as surveyed, platted and recorded in Sarpy County, Nebraska

and
Parcel 2

Tiburon Pointe Lot1 EXC IRR SE PT TAKEN FOR ROW BALLENA REPLAT I
Sarpy County, Nebraska

## Tenant Summary
### Tenant Status: Current

| Tenant Code | Tenant Name | Unit Code | Rent | Deposit | Amt Due | Status |
|---|---|---|---|---|---|---|
| r16883 | Tiburon Pointe Apartments | | | | | |
| awed01-t | Wedekind, Ann | 01 | 725.00 | 670.00 | 770.00 | Current |
| ksev01-t | Severson, Kent | 02 | 635.00 | 585.00 | 0.00 | Current |
| ljoh01-t | Johnson, Lisa | 03 | 725.00 | 715.00 | 725.00 | Current |
| ored01-t | Redden, Oscar | 04 | 630.00 | 595.00 | 630.00 | Current |
| kken01-t | Kennedy, Kenneth | 05 | 725.00 | 715.00 | 0.00 | Current |
| cyea01-t | Yeager, Charles | 06 | 645.00 | 645.00 | 695.00 | Current |
| mkno01-t | Knoblauch, Matthew | 07 | 715.00 | 705.00 | 925.00 | Current |
| mmil01-t | Miller, Mandy | 08 | 645.00 | 645.00 | 322.47 | Current |
| aheu01-t | Heuermann, Alan | 09 | 730.00 | 715.00 | -962.50 | Current |
| mvac02-t | Vaccaro, Michelle | 10 | 645.00 | 485.00 | 690.00 | Current |
| mmay01-t | Mayhan, Marda | 11 | 725.00 | 725.00 | 770.00 | Current |
| sste01-t | Stehlik, Sarah | 12 | 645.00 | 625.00 | 690.00 | Current |
| tbec01-t | Turner, Terry | 13 | 730.00 | 695.00 | 730.00 | Current |
| ssch00-t | Schlaebitz, Sheila | 14 | 735.00 | 735.00 | 0.00 | Current |
| pbor01-t | Borovac, Peter | 15 | 735.00 | 725.00 | 0.00 | Current |
| wmil01-t | Milone, Jake | 16 | 735.00 | 735.00 | 780.00 | Current |
| ebec01-t | Bechtel, Eric | 17 | 755.00 | 755.00 | 1,132.70 | Current |
| zban01-t | Bandy, Zachary | 18 | 755.00 | 755.00 | -377.50 | Current |
| dbe01-t | Bell, Debbi | 19 | 715.00 | 680.00 | 760.00 | Current |
| lhob01-t | Hobbs, Lee | 20 | 735.00 | 735.00 | 760.00 | Current |
| rsau01-t | Sauer, Robert | 21 | 735.00 | 735.00 | 785.00 | Current |
| bgra01-t | Graham, Brian | 22 | 735.00 | 725.00 | 780.00 | Current |
| dmor01-t | Morgan, Danielle | 23 | 735.00 | 735.00 | 965.36 | Current |
| tkut01-t | Kutz, Trisha | 24 | 755.00 | 755.00 | 855.00 | Current |
| ngen02-t | Genaidy, Nancy | 25 | 735.00 | 695.00 | 780.00 | Current |
| sban01-t | Banks, Sean | 26 | 755.00 | 755.00 | 755.00 | Current |
| lhag01-t | Hageman, Lindsey | 27 | 745.00 | 745.00 | 745.00 | Current |
| nmor02-t | Moreau, Natalie | 28 | 755.00 | 755.00 | 786.50 | Current |
| ewil01-t | Williams, Elizabeth | 29 | 755.00 | 755.00 | -755.00 | Current |
| rhar01-t | Harris, Ron | 30 | 760.00 | 725.00 | 820.00 | Current |
| r16889 | Tiburon Pointe Apartments | | | | | |
| jkav01-t | Kavan, Jacob | 01 | 715.00 | 705.00 | 715.00 | Current |
| tboe01-t | Boehmer, Timothy | 02 | 635.00 | 635.00 | 635.00 | Current |
| sspeo1-t | Spethman, Sandra | 03 | 725.00 | 715.00 | 770.00 | Current |
| ksle01-t | Bauer, Joan | 04 | 635.00 | 595.00 | 0.00 | Current |
| hdav01-t | Davis, Heath | 05 | 725.00 | 695.00 | 705.00 | Current |
| ktho01-t | Thompson, Kent | 06 | 635.00 | 635.00 | 635.00 | Current |
| pmch01-t | McHenry, Paul | 07 | 725.00 | 695.00 | 0.00 | Current |
| chis01-t | Hiser, Christopher | 08 | 560.00 | 550.00 | 560.00 | Current |
| ttha01-t | Pham, Thuy | 09 | 735.00 | 735.00 | 735.00 | Current |
| megg01-t | Egger, Mark | 10 | 645.00 | 635.00 | 0.00 | Current |
| lbar01-t | Barnard, Luke | 11 | 725.00 | 725.00 | 0.00 | Current |
| tsmi01-t | Smith, Todd | 12 | 645.00 | 595.00 | 670.00 | Current |
| gkap01-t | Kapustka, Gary | 13 | 735.00 | 695.00 | 825.00 | Current |
| dswa01-t | Swanson, Dennis | 14 | 735.00 | 735.00 | -80.00 | Current |
| kpra01-t | Progasam, Karthikeyan | 15 | 735.00 | 725.00 | 735.00 | Current |
| cfal01-t | Falcone, Christopher | 16 | 735.00 | 715.00 | 735.00 | Current |
| tchr01-t | Christensen, Todd | 17 | 745.00 | 735.00 | 745.00 | Current |
| lzes01-t | Zessin, Lennie | 18 | 745.00 | 735.00 | 790.00 | Current |
| khol01-t | Holland, Kerry | 19 | 735.00 | 725.00 | 785.00 | Current |
| tand01-t | Andersen, Todd | 20 | 735.00 | 735.00 | 780.00 | Current |
| bmar01-t | Maresh, Bailey | 21 | 735.00 | 735.00 | 780.00 | Current |
| bbel01-t | Bell, Bryan | 22 | 735.00 | 735.00 | 735.00 | Current |
| aell01-t | Ellis, Alissa | 23 | 735.00 | 735.00 | 0.00 | Current |
| jgan02-t | Gandha, Jyoti | 24 | 755.00 | 755.00 | 755.00 | Current |
| tlon01-t | Long, Tiffany | 25 | 735.00 | 725.00 | 780.00 | Current |
| eper01-t | Perez, Eric | 26 | 755.00 | 755.00 | 800.00 | Current |

EXHIBIT

tabbies®

## Tenant Summary
### Tenant Status: Current

| Tenant Code | Tenant Name | Unit Code | Rent | Deposit | Amt Due | Status |
|---|---|---|---|---|---|---|
| cpat01-t | Patterson, Chris | 27 | 745.00 | 745.00 | 745.00 | Current |
| tric01-t | Rice, Tyler | 28 | 765.00 | 755.00 | 810.00 | Current |
| bluh01-t | Luhr, Brian | 29 | 735.00 | 735.00 | 735.00 | Current |
| jlys01-t | Lysholm, James | 30 | 720.00 | 700.00 | -45.00 | Current |
| | | | 42,970.00 | 42,110.00 | 32,392.03 | |

Other Executory Contracts:

Waste Disposal Contract with Deffenbaugh Industries